# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF INDIANA
## SOUTH BEND DIVISION

| | | |
|---|---|---|
| ALPHONZO GRIFFIN, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | CAUSE NO. 3:10-CV-293 |
| | ) | |
| SUPERINTENDENT, | ) | |
| | ) | |
| Respondent. | ) | |

## OPINION AND ORDER

This matter is before the Court on a Petition under 28 U.S.C. Paragraph 2254 for Writ of Habeas Corpus by a person in State Custody filed by Alphonzo Griffin, a *pro se* prisoner, on July 16, 2010. (DE #1). For the reasons set forth below, the Court **DENIES** the habeas corpus petition and **DENIES** a certificate of appealability.


BACKGROUND

In deciding this habeas petition, the Court must presume the facts set forth by the state courts are correct. 28 U.S.C. § 2254(e)(1). It is Griffin's burden to rebut this presumption with clear and convincing evidence. *Id.* Griffin is serving a 50-year sentence for aiding a robbery in St. Joseph County under Cause No. 71D01-0204-FA-0017. On direct appeal, the Indiana Court of Appeals set forth the facts surrounding Griffin's offense as follows:

For three to four months prior to November 29, 2001,
Griffin, Larry Smith, Ronald Williams, Ronald Brownlee,
and Milton Brown planned to rob Charles Long, who managed
several bingo halls, and the majority of the planning of
the robbery occurred at Griffin's house. Griffin, who was
a regular patron of the bingo halls managed by Long, told
Smith and Williams that Long took money from the bingo
halls to his house at night to count it and that
sometimes a police officer would follow Long home.
Griffin told them that Long would have three to four
hundred thousand dollars and some jewelry at his house.
Griffin also showed them what kind of car Long drove.
Griffin had originally planned to go with the others when
they went to Long's house to rob him, but the group
decided that there was a risk that Long, who knew Griffin
as a bingo patron, might recognize Griffin's voice and
build and that Griffin needed to establish an alibi.

On November 29, 2001, Griffin, Smith, Williams, and
Brownlee were at Griffin's house, and they discussed
going to Long's house that night to rob him. Griffin gave
them his handgun to use in the robbery, and then Smith,
Williams, and Brownlee followed Griffin to the bingo hall
to verify that Long was there. Smith, Williams, and
Brownlee, equipped with guns, masks, duct tape, and
walkie-talkies, later drove to Long's house and waited
for him to come home.

Long arrived home with his stepson, Richard Barnard, and
as Long unlocked the door, Williams, Smith, and Brownlee
forced Long and Barnard inside at gunpoint. As they went
inside the house, Richard Mulhaupt, who lived with Long,
came to the front door to meet Long. While Smith searched
the house, Brownlee bound Barnard's and Mulhaupt's feet
and hands with duct tape. As Williams pointed his gun at
Long, he tried to grab hold of Long's hands in order to
detain him. Long resisted and tried to grab Williams's
gun. The two struggled, Williams shot Long in the chest,
and Long fell to the floor. Williams pulled Long off of
the floor and forced him to the basement so that Long
could open his safe. Williams took Long's wallet and
jewelry from him and took jewelry, cash, a coin
collection, gold Kruggerands, and gold and silver
certificates from the safe. After Williams, Smith, and
Brownlee left Long's house, they hid their car at Brown's
house, picked up Griffin, and returned to Brown's house
to inspect what they had taken from Long's house. They
later drove to Chicago to pawn the items.

*Griffin v. State*, No. 71A03-0312-CR-477(Ind. App. Ct. Sept. 10, 2004), slip op. at 2-4 (internal footnotes omitted). The state charged Griffin with aiding a robbery, conspiracy to commit robbery, and receiving stolen property, but dismissed the stolen property charge during trial. *Id.* at 4. Smith, Brownlee, and Williams entered into plea agreements with the state and testified against Griffin at his trial. *Id.* The jury found Griffin guilty of aiding a robbery and conspiracy to commit robbery. (DE #8-1 at 8.) The trial court entered judgment on the aiding a robbery conviction,[1] and sentenced Griffin to a term of 50 years in prison. (*Id.* at 9.)

Griffin appealed, raising two arguments: (1) the trial court abused its discretion in limiting the scope of his cross-examination of Smith, Brownlee, and Williams regarding their plea agreements with the state; and (2) the trial court committed fundamental error by continuing the trial after regular court hours and submitting the case to the jury to begin deliberations after midnight on the last day of trial. *Griffin*, No. 71A03-0312-CR-477, slip op. at 2. The Indiana Court of Appeals affirmed. *Id.* at 15. Griffin filed a petition to transfer with the Indiana Supreme Court, which was denied. (DE #8-2 at 4.)

---

[1] The court determined that imposing sentences for both convictions would violate double jeopardy principles under the Indiana Constitution. (DE #8-1 at 9.)

On April 15, 2005, Griffin filed a *pro se* petition for post-conviction relief claiming that his trial and appellate counsel were ineffective on numerous grounds. (DE #8-5 at 2.) Following an evidentiary hearing, the trial court denied the petition. (*Id.* at 2.) Griffin appealed, and the Indiana Court of Appeals affirmed. *Griffin v. State*, No. 71A03-0901-PC-6 (Ind. Ct. App. Apr. 14, 2010). Griffin filed a petition to transfer with the Indiana Supreme Court, which was denied. (DE #8-6 at 6.)

On July 16, 2010, Griffin filed a federal habeas petition claiming that he received ineffective assistance from his trial counsel for the following reasons: (1) counsel failed to conduct an adequate pretrial investigation; (2) counsel failed to properly interview witnesses and prepare his testimony; (3) counsel failed to object when the trial court sent the case to the jury late into the evening; and (4) counsel failed to object when the trial court limited his cross-examination of state witnesses. (DE #1 at 3-4.)

DISCUSSION

This petition is governed by the provisions of the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997). AEDPA allows a district court to issue a writ of habeas corpus on behalf of a person in custody pursuant to a state court judgment "only on the ground that he is in custody in violation of the Constitution or

laws or treaties of the United States." 28 U.S.C. § 2254(a). The court can only grant an application for habeas relief if it meets the requirements of 28 U.S.C. § 2254(d), which provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim---
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Under this deferential standard, a federal habeas court must "attend closely" to the decisions of state courts and "give them full effect when their findings and judgments are consistent with federal law." *Williams v. Taylor*, 529 U.S. 362, 383 (2000). A state court decision is "contrary to" federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court, or if the state court reaches an opposite result in a case involving facts materially indistinguishable from relevant Supreme Court precedent. *Bell v. Cone*, 535 U.S. 685, 694 (2002).

A federal court may grant habeas relief under the "unreasonable application" clause if the state court identifies the correct legal principle from Supreme Court precedent but unreasonably applies that principle to the facts of the petitioner's case. *Wiggins v. Smith,* 539 U.S. 510, 520 (2003). To

warrant relief, a state court's decision must be more than incorrect or erroneous; it must be "objectively unreasonable." *Id.* Under this standard, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." —--U.S.—---, *Harrington v. Richter*, 131 S. Ct. 770, 786 (U.S. Jan. 19, 2011).

Before considering the merits of a habeas petition, a federal court must ensure that the petitioner has exhausted all available remedies in the state courts. 28 U.S.C. § 2254(b)(1)(A); *Lewis v. Sternes*, 390 F.3d 1019, 1025 (7th Cir. 2004). The state courts must be given the first opportunity to address and correct violations of their prisoner's federal rights. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999); *Perruquet v. Briley*, 390 F.3d 505, 514 (7th Cir. 2004). For that opportunity to be meaningful, the petitioner must fairly present his constitutional claims in one complete round of state review. *Baldwin v. Reese*, 541 U.S. 27, 30-31 (2004); *Boerckel*, 526 U.S. at 845.

The companion procedural default doctrine, also rooted in comity concerns, precludes a federal court from reaching the merits of a claim when: (1) the claim was presented to the state courts and was denied on the basis of an adequate and independent state law procedural ground; or (2) the claim was not presented to the state courts and it is clear those courts would now find the claim

procedurally barred under state law. *Coleman v. Thompson*, 501 U.S. 722, 735 (1991); *Perruquet*, 390 F.3d at 514. When a habeas petitioner fails to fairly present his claim to the state courts and the opportunity to raise that claim has now passed, the claim is procedurally defaulted. *Boerckel*, 526 U.S. at 853-54.

All of Griffin's claims are premised on ineffective assistance of counsel. To prevail on a claim of ineffective assistance, the petitioner must show that counsel's performance was deficient and that the deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668 (1984). On the deficiency prong, the central question is "whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices." *Harrington*, 131 S. Ct. at 788. The Court presumes that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment," *Strickland*, 466 U.S. at 690, and will "evaluate [counsel's] performance as a whole rather than focus on a single failing or oversight." *Ebert v. Gaetz*, 610 F.3d 404, 411 (7th Cir. 2010). Review of counsel's performance is deferential, and there is an added layer of deference when the claim is raised in a habeas proceeding. *Id.* at 412. On habeas review the question is not whether counsel's actions were reasonable, but "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 131 S. Ct. at 787.

On the prejudice prong, the petitioner must demonstrate a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is a probability "sufficient to undermine confidence in the outcome," and it is not enough to show that the errors had "some conceivable effect on the outcome of the proceeding." *Id*. at 693. Where it is expedient to do so, the Court may resolve an ineffective assistance claim solely on the prejudice prong, because if the petitioner cannot establish prejudice, there is no need to "grade" counsel's performance. *Id.* at 697.

## A.   Claim One

Griffin first claims that counsel failed to conduct an adequate investigation into "the facts and circumstances of the case."(DE #1 at 3; DE #15-1 at 7.) Specifically, he claims that "[h]ad counsel conducted a professional investigation, counsel would have learned that Griffin was not the mastermind responsible for the armed robbery that had been planned and executed by Larry Smith, Ronald Brownlee, and Ronald Williams." (DE #15-1 at 7.) He further asserts that a "professional investigation would have revealed the extensive criminal history of the felon witnesses." (*Id.* at 9.)

Under the Sixth Amendment, counsel has "a duty to make reasonable investigations or to make a reasonable decision that

8

makes particular investigations unnecessary." *Strickland*, 466 U.S at 690-91. The decision whether to investigate must be assessed for reasonableness based on the circumstances, "applying a heavy measure of deference to counsel's judgments." *Id.* at 691. To establish prejudice in connection with counsel's failure to investigate, the petitioner must make a "comprehensive showing" of what further investigation would have revealed. *United States v. Zillges*, 978 F.2d 369, 373 (7th Cir. 1992).

In rejecting Griffin's ineffective assistance claim on post-conviction review, the Indiana Court of Appeals properly identified *Strickland* as the governing standard. *Griffin*, No. 71A03-0901-PC-6, slip op. at 4. The court determined that Griffin failed to establish prejudice in connection with this claim because he failed to show what further investigation would have uncovered. *Id.* at 4-5. Based on the record, this was not an unreasonable application of *Strickland*.

The record shows that Griffin's counsel, a public defender with more than thirty years of experience at the time of Griffin's trial, conducted an extensive pretrial investigation of the case. (Post-Conviction ("PCR") Transcript ("Tr.") at 19.) He indicated to the court that he had "stopped keeping track" of the number of hours he spent on the case, but estimated it to be approximately 100 hours, with 60 hours of that spent during the four-day jury trial. (Sentencing Tr. at 37-38.) To prepare for trial counsel

examined the numerous statements made by Griffin's co-conspirators in depositions, statements to police, and at prior trials,[2] and met with Griffin on several occasions. (PCR Tr. at 10-11, 19-21.)

The record demonstrates that as a result of his pretrial preparation, counsel was well-prepared for trial and well-versed in the facts of the case. Counsel's pretrial preparation enabled him to vigorously cross-examine the state's cooperating witnesses---Smith, Williams, and Brownlee---about the deals they had made with the state in exchange for their testimony, including the fact that they had been granted immunity for their testimony. (Trial Tr. at 444-90, 537-68, 626-56.) Counsel was also well aware of the criminal histories of these witnesses. Prior to trial, the state filed a motion in limine seeking to preclude any mention of the witnesses' prior offenses that did not result in a conviction or were more than 10 years old. (Trial Tr. at 54-55.) Griffin's counsel argued at length that he should be allowed to conduct a more expansive questioning into the witnesses' criminal history in light of the plea agreements they had reached in exchange for their testimony, but the trial court rejected his arguments. (*Id.* at 55-

---

[2] The record shows that prior to Griffin's trial, his girlfriend Nerissa Winston was tried on charges of aiding in the robbery; she testified on her own behalf and was acquitted. (Trial Tr. at 48-50, 650-56; Def.'s Tr. Ex. E.) Winston and Smith both testified as cooperating state witnesses at the trial of Williams, which ended in a mistrial. (Trial Tr. at 656; Def.'s Tr. Ex. D.) Williams pled guilty on the day his retrial was scheduled to begin, and later became a cooperating witness against Griffin. (Trial Tr. at 656.)

61.) At trial, the witnesses' admissible offenses were brought out by the state during direct examination. (Trial Tr. at 476-77, 625-31.) During cross-examination Griffin's counsel questioned them about additional offenses that had been dismissed as a result of the plea agreements. (Trial Tr. at 444-90, 537-68, 626-56.) There is nothing in the record to indicate, nor has Griffin submitted any evidence, showing that these witnesses had other admissible offenses which his counsel failed to uncover.

Counsel's pretrial preparation also enabled him to vigorously cross-examine the police officer who first obtained statements from these witnesses inculpating Griffin. (Trial Tr. at 356-81.) Counsel elicited testimony from the officer that he had a personal relationship with the victim, and that he had taken the unusual step of obtaining permission from the prosecutor's office to offer deals to these witnesses even before his first meeting with them. (Trial Tr. at 356-68.) Counsel also questioned the police officer extensively about his initial interview with Smith, in which he falsely told Smith that Griffin had incriminated him prior to Smith making the statements incriminating Griffin. (Trial Tr. at 365-81.)

Although counsel obviously had no control over the fact that the state's cooperating witnesses claimed Griffin was one of the masterminds of the robbery, he questioned them extensively about their planning of the crime in an effort to downplay Griffin's role. During careful questioning about the events leading up to the

robbery, he elicited testimony from Smith and Brownlee showing that some of their knowledge of Griffin's involvement came through information Williams gave them rather than from conversations they had with Griffin directly. (Trial Tr. at 463-67, 541, 551-54.) Counsel also was able to elicit testimony from Williams that he had engaged in some of the early planning of the offense with Griffin's live-in girlfriend Nerissa Winston rather than Griffin. (Trial Tr. at 635-38.)

Despite counsel's efforts, the jury chose to credit the testimony of the state's cooperating witnesses that Griffin was intimately involved in the offense, and that he did not participate in the robbery only because the group was concerned that he might be recognized. No doubt the jury was influenced by Griffin's own testimony, in which he admitted dealing drugs out of the home he shared with Winston. (Trial Tr. at 679-97.) He also acknowledged that he had been present on multiple occasions when Williams, Smith, and the others were planning the crime. (*Id.*) He offered unbelievable testimony that for months he thought they were joking about their plans; he further testified that once he realized they were serious, he went along with them because of the "code in the streets" and his desire to impress Winston. (Trial Tr. at 681-705, 707.) As a result of Griffin's decision to testify, the prosecutor was also permitted to question him about his three prior

convictions for theft, conversion, and attempted robbery.[3] (Trial Tr. at 712.) Based on the record, Griffin has not established that counsel was deficient in his investigation of the state's witnesses, or that in the absence of an error by counsel the result of the proceeding would have been different.

Griffin also asserts that counsel should have discovered prior to the trial that he was a "mentally handicapped person who could not have been the mastermind for the armed robbery in this case." (DE #15-1 at 11.) That is not a claim he raised on appeal in the post-conviction proceedings, so the claim would be procedurally defaulted. (*See* #DE 8-7.) Regardless, the trial record belies Griffin's claim that he was suffering from a mental handicap that precluded his participation in the offense. Throughout his trial testimony Griffin was articulate, responsive, and coherent. (*See* Trial Tr. at 678-712.) At no time did he appear to have any difficulty understanding or responding to counsel's questions. His testimony also showed that he had the mental capacities to operate

---

[3] The record shows that Griffin had a lengthy criminal record dating back more than thirty years, including three prior burglary convictions and an involuntary manslaughter conviction stemming from one of the burglaries. (Sentencing Tr. at 35.) Several of these offenses were inadmissible under IND. R. EVID. 609 because they were more than 10 years old. Griffin's counsel objected to the prosecutor's reference to the theft conviction, but was overruled. (Trial Tr. at 710.) Counsel requested that the court instruct the jury that the conviction was admissible for the limited purpose of evaluating Griffin's credibility, and the jury was so instructed. (Trial Tr. at 710-11.)

an extensive drug business that served as his sole means of support.

In addition to his testimony, Griffin was also an active and vocal observer during his trial. He raised concerns directly to the court about evidentiary rulings he disagreed with, as well as about a disagreement he was having with counsel over the presentation of the defense case. (Trial Tr. at 499-518.) During his interactions with the court he was again fully comprehensible, coherent, and demonstrated an understanding of the issues presented by his case. In short, there is no basis in the record to conclude that counsel was deficient in failing to discover that Griffin was suffering from a "mental handicap" that prevented him from committing the offense.

Griffin has failed to establish that his counsel was deficient in conducting a pretrial investigation, or that in the absence of an error by counsel the result of the proceeding would have been different. The state court's resolution of this claim was not unreasonable and, accordingly, the claim is denied.

**B.    Claim Two**

Griffin next claims that counsel was deficient in failing to interview him and Winston and in failing to adequately prepare his testimony. (DE #1 at 3; DE #15-1 at 12-14.) In rejecting this claim, the Indiana Court of Appeals determined that Griffin failed to make the necessary showing of prejudice. *Griffin*, No. 71A03-

0901-PC-6, slip op. at 5-6. Based on the record, this was not an unreasonable application of *Strickland*.

Again, the record shows that prior to trial, counsel reviewed the prior statements given by Winston as well as the other co-conspirators. (PCR Tr. at 10-11, 19-21.) Counsel also subpoenaed Winston to testify at trial after it was determined that the state was not going to call her as a witness, but after consulting with an attorney she invoked her Fifth Amendment right against self-incrimination. (Trial Tr. at 515-16, 572-96.) The trial court would not permit defense counsel to put Winston on the stand once she invoked her Fifth Amendment right. (*Id.*) After this avenue failed, Griffin's counsel successfully sought to introduce portions of Winston's testimony from her own trial, in which she testified that she never would have allowed anyone to plan a robbery in the home she and Griffin shared. (Trial Tr. at 596; Def.'s Tr. Ex. D-E.) Based on the record, Griffin has failed to show that counsel rendered deficient performance in connection with Winston's testimony or that, in the absence of an error by counsel, the result of the proceeding would have been different.

As to his own testimony, Griffin does not explain precisely how counsel was deficient in failing to interview or otherwise prepare him, but the record shows that the two met several times prior to trial, including the day before trial. (PCR Tr. at 9-10.) Counsel also requested a break immediately before Griffin testified

15

so that the two could confer. (Trial Tr. at 675.) Although Griffin's testimony was not entirely favorable, once he made the decision to testify his attorney was duty bound to instruct him to provide truthful testimony. *See* IND. R. PROF'L CONDUCT 3.3. Griffin again suggests that his counsel should have discovered that he was "mentally retarded," but as stated above there is nothing in the record to support this factual assertion. In sum, Griffin has not established that counsel rendered deficient performance in this regard.

Griffin has also failed to establish that in the absence of an error by counsel, the result of the proceeding would have been different. There was overwhelming evidence from the state's cooperating witnesses that Griffin came up with the idea to commit the robbery and was intimately involved in the crime from start to finish, including identifying the victim's car, providing a gun that was used in the robbery, and assisting in disposing of the stolen property. Although Griffin does not find these witnesses credible, the jury did. The state court's rejection of Griffin's ineffective assistance claim was not unreasonable and, accordingly, the claim is denied.

### C. Claim Three

Griffin next claims that counsel was deficient in failing to object when the trial court sent the case to the jury for deliberations late into the evening on the last day of trial. (DE

16

#1 at 4.) In rejecting this claim, the Indiana Court of Appeals determined that Griffin failed to make the necessary showing of prejudice. *Griffin*, No. 71A03-0901-PC-6, slip op. at 6-7. Based on the record, this was not an unreasonable application of *Strickland*.

The record shows that at the start of the trial the court advised the jury that the trial would likely last four or five days. (Trial Tr. at 77.) During the trial the court stated to the parties that it had a conflict on Friday, such that if the trial was not completed by Thursday they would have to resume the following Monday. (Trial Tr. at 236-37.) On Thursday, the final day of trial, proceedings began around 9:00 a.m., with the court addressing numerous procedural matters with the attorneys while the jury waited in the jury room. (Trial Tr. at 497-519.) The jury was eventually seated and proceeded to hear testimony from Brownlee until approximately 11:30 a.m. (Trial Tr. at 519-569.) The court then excused the jurors for lunch and told them to return at 1:00 p.m. (*Id.* at 569.)

After the jury left the courtroom, Winston, who had been subpoenaed by the defense, was brought before the court. Discussions ensued about her desire to exercise her Fifth Amendment privilege. (*Id.* at 572-78.) The court appointed an attorney to represent her and told her to consult with the attorney and report back at 1:00 p.m. (*Id.* at 578.) At 1:00 p.m. the attorneys returned, along with Winston, and discussions ensued about various

17

procedural matters, including the issue of Winston's testimony. Winston ultimately asserted her Fifth Amendment privilege and was released from the subpoena. (*Id.* at 585-95.)

Shortly after 2:00 p.m., the jury was brought back into the courtroom and Williams was called as a witness. (*Id.* at 595-97.) Williams' testimony concluded shortly after 3:30 p.m.(*Id.* at 658-59.) The court then excused the jury again and told them to return at approximately 4:00 p.m. (*Id.* at 658.) At that point, Griffin's counsel notified the court that, given Winston's unavailability, he wished to present transcripts of her testimony from two prior court proceedings. (*Id.* at 659-60.) The court granted a short recess so the prosecutor could review the transcripts. (*Id.* at 661.) Thereafter, court resumed and, after the issue of the transcripts was resolved, the final jury instruction conference began. (*Id.*) At 4:00 p.m., the jury was told via the bailiff that more time was needed to resolve procedural matters and that they should remain on break. (*Id.*)

Sometime around 5:00 p.m., while the jury instruction conference was still underway, defense counsel informed the court that Griffin was having "a problem." (*Id.*) Counsel stated that it had just come to his attention that Griffin was diabetic and that he had been due for an insulin shot at 4:00 p.m. (*Id.*) Discussions then ensued about the schedule for the remainder of the day. Defense counsel expressed a concern that Griffin would not be going

before the jury "fresh" given the length of the proceedings that day. (*Id.* at 663.) After further discussions, including Griffin confirming that he planned to testify, the court determined that the jury should decide whether to proceed further into the evening. (*Id.* at 665.) The court proposed taking a break, during which the jury could eat dinner and Griffin could receive food and medical treatment, and then proceeding with the remainder of the trial. (*Id.*) The court stated, "I'm going to ask the jury if they can live with this. I don't want to just assume it and have them mad or something. So, you know, if they have a problem with it, then we're going to have to wait until Monday." (*Id.*) The court brought out the jury, advised them of the need for Griffin to eat and receive medical treatment, and then stated as follows:

> My proposal is that [a court staff member] call in your meal. Then you can go out of the building or stay in the jury room. Your meal will be here within about an hour.
>
> As soon as the defendant has had his medical shot for the insulin and has had a chance to eat a little something, we could go forward. I kind of think that the rest of the evidence is probably going to be I am guessing about an hour's worth.
>
> We have done almost all the instructions. While you are eating, we would finish the instructions. You would then get the case. When would you get the case? My guess it could be about eight-thirty. That's my best guess. If we don't do that, then I'm going to tell you to go home now, and I'm going to have you come back Monday. What do you want to do?

(Trial Tr. at 666.) One of the jurors responded, "Let's do it."
(*Id.*) The court asked the rest of the jurors, "Are you okay with
that?" and they responded affirmatively. (*Id.* at 667.)

The court then took a recess so that Griffin could eat and
receive medical treatment. (*Id.*) Proceedings resumed sometime
thereafter, and the court inquired whether Griffin had received
food and medicine. (*Id.* at 674.) Griffin stated that he had. (*Id.*)
The court asked, "Has that helped you?" and Griffin confirmed that
it did. (*Id.*) The court then continued with the jury instruction
conference until around 9:00 p.m. (*Id.* at 667-75.) At that time the
jury was brought back into the courtroom, and the defendant took
the stand at 9:12 p.m. (*Id.* at 678.) His testimony was followed by
closing arguments and final jury instructions.(*Id.* at 679-766.) The
jury began its deliberations at 12:06 a.m and reported to the court
that it had a verdict at 2:05 a.m. (*Id.* at 766-68.)

Griffin claims that counsel was deficient in failing to object
when the trial court allowed the proceedings to continue so late
into the evening. (DE #1 at 4; DE #15-1 at 15-17.) However, Griffin
fails to recognize that his counsel was faced with a difficult
decision. If counsel objected and successfully gained a
continuance, he risked angering the jurors, since they had
expressed a preference for completing the trial that evening rather
than having to return the following week. Faced with a choice
between potentially alienating the jury or proceeding despite the

20

late hour, counsel opted to proceed. Griffin has failed to overcome the presumption that counsel made a reasonable strategic decision under the circumstances.

There is no indication from the record that the jury's verdict was the product of fatigue. Although the jurors put in a long day, much of their time that day had been spent on breaks and/or waiting in the jury room while procedural matters were resolved. At the time deliberations began, the jurors had been in court for approximately 2 hours in the morning, 1.5 hours in the afternoon, and 3 hours after dinner. They deliberated for a reasonable amount of time despite the late hour, and they appear to have gone about their duties carefully, as they sent a question to the court to aid in their deliberations. (Trial Tr. at 766.) The jurors were also individually polled and each one expressed that the verdict represented their unanimous decision. (*Id.* at 769-771.)

There is also no basis in the record to conclude that Griffin was unduly fatigued during the evening proceedings. Griffin claims that as a result of the late hour at which he testified, "the jury heard the ramblings of a mentally retarded and uneducated diabetic who did not understand what was happening and did not understand anything about the conduct of a criminal trial." (DE #15-1 at 16.) The record belies this assertion. Although the day was no doubt a long one for all the case participants, including Griffin, the record shows that he received two meal breaks, and during the

dinner break he received care for his medical issues. After the dinner break the judge asked him how he was feeling, and he reported that he felt better. (Trial Tr. at 674.) His attorney asked him at the start of his testimony whether after receiving food and medicine he was "back to fairly normal." (*Id.* at 679.) He replied, "Yeah, back to normal." (*Id.*) Although Griffin had demonstrated a willingness to approach the court when he had a concern about the trial proceedings, at no point did he indicate that he was still having medical problems or was otherwise unable to proceed.

Furthermore, the testimony that Griffin gave was coherent, responsive, and detailed.[4] Although the jury ultimately did not believe his testimony that he was only tangentially involved in the robbery, there is nothing to indicate that the jury would have found his testimony more credible had the case continued into the following week. The question for this Court is not whether proceeding with a trial until 2 a.m. represents "best practices," but whether defense counsel's failure to demand a continuance amounted to incompetence under the circumstances. *Harrington*, 131 S. Ct. at 788. Given the options counsel was faced with and the deferential review of counsel's strategic decisions, this Court

---

[4] The Court notes that the record indicates Griffin routinely kept late hours. There was evidence that he and Winston went out to play bingo almost every night of the week until 10:30 or 11 p.m., and that he regularly sold drugs up until midnight and sometimes later. (Trial Tr. at 610-13, 686, 696.)

cannot conclude that he was deficient in failing to demand a
continuance.

Griffin also has not demonstrated that an objection by counsel
would have resulted in a continuance. The trial court made it clear
that it wished to leave the decision up to the jury, and the jury
expressed a desire to try to complete the proceedings that evening.
(Trial Tr. at 665-67.) On direct appeal, Griffin claimed that the
trial court committed fundamental error in allowing the proceedings
to go so late notwithstanding the jury's preference. *Griffin*, No.
71D01-0204-FA-17, slip op. at 12-13. The appellate court found no
error, let alone fundamental error, in the trial court's decision
to proceed despite the late hour. *Id.* at 13. Had counsel preserved
an objection, the trial court's decision would have been reviewed
for an abuse of discretion, but there is no basis to conclude that
the claim would have fared any better under that standard. *See King
v. State*, 531 N.E.2d 1154, 1161 (Ind. 1988). As the appellate court
observed, in cases involving similar facts the Indiana Supreme
Court found no abuse of discretion. *See id.; see also Peck v.
State*, 563 N.E.2d 554 (Ind. 1990) (trial court did not abuse its
discretion in sending case to the jury after 9 p.m. and allowing
jury to deliberate until 1:30 a.m.); *King*, 531 N.E.2d at 1161 (no
abuse of discretion where trial court continued proceedings until
after 11 p.m. despite the defendant's repeated objections).

Because there is no basis to conclude that an objection by counsel would have resulted in a more favorable outcome for Griffin, his claim fails on the prejudice prong as well. The state court's rejection of Griffin's claim was not an unreasonable application of *Strickland* and, accordingly, the claim is denied.

**D.  Claim Four**

In his final claim, Griffin argues that counsel was deficient in failing to object when the trial court limited his cross-examination of the state's cooperating witnesses. (DE #1 at 4.) In rejecting this claim, the Indiana Court of Appeals determined that Griffin failed to make the necessary showing of prejudice. *Griffin*, No. 71A03-0901-PC-6, slip op. at 6-7. Based on the record, this was not an unreasonable application of *Strickland*.

Much of Griffin's argument in support of this claim consists of boilerplate, such as that he had a "right of face to face confrontation with [the] witnesses against him." (*See* DE #15-1 at 17.) While his general statements of the law are essentially accurate, none of these statements show that his counsel's performance was deficient. Griffin's specific complaint appears to be that counsel "failed to adequately cross-examine the [cooperating] witnesses in order to uncover their criminal history." (*Id.* at 18.) However, as stated above, counsel was aware of the witnesses' criminal histories and questioned them about their prior offenses during his cross-examination, to the extent

that information was not already provided during direct examination. (Trial Tr. at 431, 444-90, 537-68, 626-56.) There is nothing in the record to indicate, nor has Griffin submitted any evidence, showing that these witnesses had other admissible offenses that counsel did not seek to introduce.

Counsel also questioned these witnesses extensively about their plea agreements with the state, including the fact that the agreement encompassed unrelated criminal charges. Although the court limited counsel's cross-examination by refusing to permit questions regarding the nature of unrelated charges that had been dismissed, counsel objected and argued repeatedly that he should be allowed to question them further on this point. (Trial Tr. at 54-61, 391-95.) The fact that the trial court rejected counsel's arguments based on its view of state evidentiary law cannot be attributed to counsel's performance.

Griffin also asserts that counsel "failed to object and challenge the paid testimony of State witnesses who were the actual planners and participants in the robbery."[5] (DE #15-1 at 18.) However, Griffin's counsel had no control over the fact that these witnesses implicated Griffin in the robbery, nor was there any basis for counsel to "object" to these witnesses simply because

_____

[5] Although it is clear from the record that the cooperating witnesses received plea bargains in exchange for their testimony, there is nothing anywhere in the record, nor has Griffin provided any evidence, showing that these witnesses were "paid" for their testimony.

25

they received plea bargains in exchange for their testimony. As stated above, counsel took multiple steps to point out to the jury that these witnesses had a strong motive to provide testimony favorable to the state. The fact that the jury ultimately chose to credit the testimony of these witnesses cannot be attributed to any failing by counsel.

Griffin also has not established prejudice in connection with this claim. To the extent he is claiming that counsel should have cross-examined the cooperating witnesses in a more detailed fashion about their plea agreements, there was already substantial evidence before the jury about the agreements these witnesses had with the state. There is nothing to indicate that had counsel gone into more detail in his questioning in some unspecified way, the result of the proceeding would have been different. The state court's rejection of this claim was not unreasonable and, accordingly, the claim is denied.

### E.   Certificate of Appealablity

As a final matter, pursuant to Rule 11 of the Rules Governing Section 2254 Cases, the Court must either issue or deny a certificate of appealability in all cases where it enters a final order adverse to the petitioner. To obtain a certificate of appealability, the petitioner must make a substantial showing of the denial of a constitutional right by establishing "that reasonable jurists could debate whether (or, for that matter, agree

that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (internal quotation marks and citation omitted). For the reasons fully explained above, Griffin has not made a substantial showing of the denial of a constitutional right, nor could jurists of reason debate the outcome of the petition. Accordingly, the Court declines to issue a certificate of appealability.

CONCLUSION

For the reasons set forth above, the court **DENIES** the petition (DE #1) and **DENIES** a certificate of appealability.

**DATED: March 18, 2011**           **/s/RUDY LOZANO, Judge**
                                          **United States District Court**